# UNITED STATES DISTRICT COURT
для the
District of Maryland

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Robert Harrison, Jr. | ) Case No. | **14-0754 TJS** |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  January 27 through March 27, 2014  in the county of  Baltimore City  in the  District of  Maryland , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Conspiracy to Use Interstate Commerce Facilities in the Commission of a Murder for Hire |

This criminal complaint is based on these facts:

See attached affidavit

☐ Continued on the attached sheet.

FILED _____ ENTERED
LODGED _____ RECEIVED

MAR 28 2014

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

_____
*Complainant's signature*

S/A Eric S. Nye, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  03/28/2014

_____
*Judge's signature*

City and state:  Baltimore, Maryland

Hon. Timothy J. Sullivan, U.S. Magistrate Judge
*Printed name and title*

AFFIDAVIT OF ERIC S. NYE, SPECIAL AGENT
DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION

I, ERIC S. NYE, being duly sworn, do hereby depose and state:

Introduction:

1. Your affiant is a Special Agent for the Department of Justice, Federal Bureau of Investigation (DOJ/FBI). I have been a Special Agent since 2006 and assigned to the Safe Streets Task Force (SSTF) of the Baltimore office of the FBI since 2008.

2. This affidavit is made in support of a complaint against Derrick Smith, aka Chubb and Robert Harrison, Jr., charging them with conspiracy to use interstate commerce facilities in the commission of a murder for hire, in violation of 18 U.S.C. §1958. The statute reads as follows:

"Use of interstate commerce facilities in the commission of murder-for-hire," provides:

(a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, **or who conspires to do so**, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $250,000, or both.

(b) As used in this section and section 1959-

1) "anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage;

2) "facility of interstate or foreign commerce" includes means of transportation and communication; and

3) "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

3. The SSTF received information from a cooperating witness (CW1) that Smith had committed a number of contract murders in Baltimore, Maryland over a number of years. CW1 described Smith as a contract killer. CW1 explained further that he knew Smith to be a contract killer as CW1 had personally contracted with Smith in the past to commit murders.

4. In January 2014, the SSTF made contact with Smith through the use of CW1. Consensually recorded calls were placed documenting Smith's intention to commit what he believed to be a murder-for-hire. Along with this acceptance of the murder contract by Smith, an

Undercover Officer was introduced to Smith to gather additional evidence against Smith and his accomplices.

Specifics of the Crime of Murder-for-Hire:

4. On January 27, 2014, CW1 placed a consensually recorded call to Derrick Smith to discuss Smith's willingness to take a 'murder contract.' A review of the call revealed that when presented with the possibility of a murder contract Smith responded, "I'll get on top of that shit for real, you already know...that shit ain't really...a big deal." CW1 stated, "A got a couple dollars for you, and I got like two nice watches you can have." According to CW1, the words 'a couple dollars' and 'two nice watches' referred to cash and watches that would be given to Smith as payment for the murder. CW1 stated, "I definitely don't want him around when I get back from the appeal." Smith responded, "Without a doubt." CW1 explained to Smith that he would have a girl (undercover officer) meet him to provide him with a phone and some money to pursue the murder-for-hire. CW1 explained that providing a phone was normal to help coordinate the murder contract as it is a safer method as the phone is not subscribed to them. Additionally, CW1 explained that he has paid Smith for murders in the past and the normal and understood rate for a contract killing is $5,000 in Baltimore.

5. On January 31, 2014, CW1 placed a consensually recorded call to Derrick Smith in order to coordinate the details of the murder-for-hire. A review of the call revealed that Smith acknowledged that he would take the murder contract but he also stated, "I got two...little goons for real, for real." CW1 clarified that Smith's statement about "two goons" was a reference to the use by Smith of two other individuals to help him on the murder-for-hire. Smith's statement clarified that not only had he accepted the contract but that he had taken steps already to conspire with others, including Robert Harrison Jr., to commit the murder. In a follow-up call, CW1 attempted to discuss helping one of Smith's associates, also a known hitman, in prison at which time Smith interrupted CW1 and exclaimed, "We ain't really worried about Yo right now, yo...we got get you back so I can get back. Get what I'm saying?" CW1 explained that Smith wanted to quickly finish this murder contract so that CW1 would be released from prison and they could get back to doing murder contracts together. Smith has relied on CW1 in the past to provide Smith with murder contracts. Smith was explaining not to worry about the guy in jail and that they needed to worry about getting this murder done and then get back to the business of taking other murder contracts in Baltimore for their financial gain.

6. On February 4, 2014, an undercover officer (UC) of the Baltimore Police Department met with Smith at the intersection of Whitelock Street and McCulloh Street. The audio and video recordings of this meeting were made. During this meeting, Smith accepted a $500 advance on the payment ($5,000 total) for the murder and a cellular telephone to further coordinate with the UC for the murder the UC sought to have committed. The murder was scheduled to take place on Thursday, February 6, 2014. CW1 had previously explained to Smith that his girl (UC) was friends with the intended victim's girlfriend. CW1 further explained that the UC acted as a drug mule for the intended victim. Due to this background story provided by CW1, Smith believed that the UC was the only one with information concerning the whereabouts of the intended target. The UC and CW1 provided Smith with the fictitious street name of the intended murder target as "Black."

7. On February 6, 2014, the UC placed a call to the phone previously provided by the UC

to Smith. An unknown male (UM) answered the phone identifying himself as Smith's "homeboy." The UM explained that he would call Smith and let him know that the UC was trying to get a hold of him. Thereafter, the UC received a call from Smith on telephone 2▇▇▇▇▇. The UC explained that she was on the Jersey Turnpike and would be in the Security Boulevard area of Baltimore County by early afternoon. Smith instructed the UC to contact him once the UC got to Baltimore. The UC then received a call from the same UM from telephone ▇▇▇▇▇▇. This phone had previously been given by the UC to Smith to facilitate communications for the murder. The UM explained that he was outside of Smith's residence and that he would have him call the UC. A check of the court authorized geo-positioning data for that phone indicated that the phone was located in front of 934 N. Rosedale Street, Baltimore, Maryland (residence of Smith). Later that day Smith instructed the UC to go about her business because he was still trying to find his "little man." The reference to his 'little man,' your affiant believes, was to another male, later identified as Robert Harrison, enlisted by Smith to commit the murder. The murder did not take place as planned.

8. The next day, February 7, 2014, CW1 placed a consensually recorded call to Derrick Smith to find out why Smith did not meet with the UC the previous day and kill the intended victim. During this call Smith explained that, "I ain't dealin' with the same nigger that I was dealin' with though." CW1 clarified that SMITH had not been comfortable committing the murder because the people that usually assist him (Smith) on contract killings were in prison and Smith was forced to use a different person(s). SMITH went on to say, "…, but see my thing about it was that it ain't have to go down like that..., then I would have took care of myself. I'd have done that shit myself." CW1 explained that SMITH was concerned about the restrictions that were placed on the killing. The restrictions mandated by the UC included meeting her in the Security mall area of Baltimore County, following her to the hotel that the victim was supposed to be at, and kill him that day. SMITH explained that if it did not have to get done that day and the UC could provide him with the target's house he would have done it himself. SMITH went on to say, "It wasn't ah…, ah, really like a big problem. It was like a safety issue for real-for real. …, it's where we was at…, you get what I'm sayin?" SMITH expressed his concern over the location of the murder and emphasized his desire to have it in the city rather than in Baltimore County and stated, "That shit wouldn't have been no big deal. You feel what I'm sayin'? It's not really a big deal…" Later in the conversation, CW1 explained that the UC needed to meet with SMITH because she had the "shoes" (guns). SMITH replied, "I had already had …some New Balance on my feet. I had my track shoes on for real-for real." According to CW1, SMITH was explaining that he was already armed and did not need to meet to get the guns from the UC.

9. On February 27, 2014, the UC placed calls to Smith at both 2▇▇▇▇▇ and ▇▇▇▇▇▇. Neither of the phones was answered. Later that same day Smith called the UC back at which time the UC explained that a girlfriend and "Black," (the intended target of the proposed murder-for-hire) would be having a party sometime next week in Baltimore. The UC inquired as to whether or not Smith would be ready to meet her since Black would be at this party. Smith explained that he did not like making plans because, "tomorrow isn't promised."

10. On March 11, 2014, CW1 placed a consensually recorded call to Smith at 4▇▇▇▇▇. During this conversation Smith indicated that, "I was kind of hurt that I wasn't really dealin' with…the little kids that I was dealin' with when I was home…I ain't have the same little team." Based on training, knowledge, experience, and discussions with CW1, your affiant believes that the individuals that Smith has used in the past to take murder contracts are all incarcerated and he felt uncomfortable without them. Because of this, Smith has complained to CW1 that this murder is a little more difficult than the murders he has done in the past because he

doesn't have his normal "little team." Smith went on to explain that the unknown individuals he plans to use for this murder are afraid "they ain't gonna get paid."

11. On March 25, 2014, the UC placed a call to Smith at ▇▇▇▇▇▇▇. In this call the UC explained that she was going to be in Baltimore on Thursday (3/27/2014) and that she would be meeting with the intended victim, "Black." Smith instructed the UC to have CW1 call him before Thursday as he was concerned about his co-conspirators getting paid. He explained that, "I ain't really dealin' with the same little dudes that I was dealin' with…so the little dudes be wantin' some paper (a reference to money) but they don't like…they be thinkin' I'ma beat'em." Based on training, knowledge, and experience your affiant knows that Smith is concerned with not having his normal team of contract killers and explained that his new team wanted to be paid up front because they are concerned that Smith will not pay them once they kill "Black."

12. On March 25, 2014, CW1 placed a consensually recorded call to Smith at ▇▇▇▇▇▇▇. Smith did not answer but immediately called CW1 back. During this recorded conversation Smith explained to CW1 that, "You just gotta give 'em a few dollars…I'm a make sure it get done." Smith explained that he needed to meet the UC prior to Thursday because, "we gotta have everything situated before Thursday." Smith explained that he would find his partner and call CW1 back in a minute. Smith explained that, "I'm down here now. I'm ready see where he going at." A check of the court authorized pen registered confirmed that Smith immediately called telephone number ▇▇▇▇▇▇▇. This telephone number is the telephone that the UC provided Smith on February 4, 2014. Smith later explained that he provided this phone to his partner to facilitate this murder. A check of the court authorized geo-positioning data revealed that both Smith's phone and the phone provided by the UC (later found to be in the possession of Robert Harrison) were both in the vicinity of Druid Hill Avenue and Whitelock Street. Smith called CW1 back a few minutes later and put a male on the phone. Your affiant listened to the voice on the call and it is the voice of Robert Harrison, Jr. Harrison explained that he wanted, "half up front." Based on training, knowledge, and experience your affiant knows that Harrison asked for half of the murder payment prior to killing the intended target. Smith got back on the phone and explained that he would meet the UC in a hotel room on Thursday morning to receive the money and the guns, which were to be used to kill "Black."

13. On March 27, 2013, the UC placed a consensually recorded call to Smith at ▇▇▇▇▇▇▇. The UC instructed Smith to meet her at the Motel 6 (1401 Bloomsfield Avenue) near the Loafers on Caton Avenue. The UC told Smith that she had "them things" (guns) and "the half" ($2,500 or half of the total payment of $5,000) which CW1 had promised to get for Smith in advance of the murder. Smith clarified the location of Loafers Bar and Grill with the UC. Smith, who was at his girlfriend's residence at 3414 Carlisle Street, was seen walking out of the residence by an FBI surveillance team. Smith took an unlicensed taxi to 3805 Chatham Road. Your affiant knows this to be the residence of Robert Harrison. Smith left Harrison's residence and traveled to the vicinity of Druid Hill Avenue and North Avenue. From there Smith took a different unlicensed taxi to the Motel 6. Smith entered the motel room, which was under audio and video surveillance. The UC presented a shoebox to Smith on the bed and opened the box to reveal two loaded .9 mm semi-automatic handguns. Smith acknowledged the guns and then was given $2,500 by the UC. While counting the money, Smith asked the UC when she was going to "call the dude." Your affiant knows this call was intended to set the stage for the murder of "Black" later that night. After taking possession of the guns and the money, Smith was placed under arrest.

14. On March 27, 2014, shortly after the arrest of Smith, officers with the Baltimore

4

Police Department located and arrested Robert Harrison, Jr. at 3805 Chatham Road. Harrison was in possession of the phone previously provided by the UC to Derrick Smith. Harrison was interviewed and his voice was compared to the voice recorded on March 25 and it is your affiant's opinion Robert Harrison, JR. was the person who spoke with CW1 and said he wanted "half up front" before he would perform the killing.

Conclusion:

Therefore, based on the facts set forth above, your affiant believes there is probable cause that Derrick Smith and Robert Harrison, Jr. committed the crime of conspiracy to use interstate commerce facilities in the commission of a murder for hire, with the intent that a murder for hire be committed in violation of the laws of any state or the United States, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, did utilize interstate commerce facility, to wit a cellular telephone, in the commission of a murder for hire, in violation of 18 U.S.C. § 1958.

---
ERIC S. NYE, Special Agent
Department of Justice, Federal Bureau of Investigation

**Subscribed and Sworn** to before me and in my presence, this 28 day of March 2014, at Baltimore, Maryland.

---
Timothy J. Sullivan
United States Magistrate

5